*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CONIFER HOLDINGS, INC.,

       Plaintiff-Appellee,

v

INNOVATIVE NETWORK SOLUTIONS, INC.,

       Defendant-Appellant.

UNPUBLISHED
August 24, 2023

No. 361868
Oakland Circuit Court
LC No. 2021-187044-CB

---

CONIFER HOLDINGS, INC.,

       Plaintiff-Appellant,

v

INNOVATIVE NETWORK SOLUTIONS, INC.,

       Defendant-Appellee.

No. 362147
Oakland Circuit Court
LC No. 2021-187044-CB

---

Before: GADOLA, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

In Docket No. 361868, defendant, Innovative Network Solutions, Inc., appeals by right the trial court's judgment for plaintiff, Conifer Holdings, Inc., entered after a bench trial. In Docket No. 362147, plaintiff appeals by right the trial court's post-judgment order denying its motion for case evaluation sanctions pursuant to former MCR 2.403(O).[1] We affirm the judgment for plaintiff

---

[1] These appeals were consolidated "to advance the efficient administration of the appellate process." *Conifer Holdings, Inc v Innovative Network Solutions, Inc*, unpublished order of the Court of Appeals, entered July 20, 2022 (Docket Nos. 361868 and 36147).

-1-

in Docket No. 361868, vacate the trial court's order denying case evaluation sanctions in Docket No. 362147, and remand for additional proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 2018, plaintiff purchased from defendant three computer system firewalls: a 5516 Cisco firewall to be used as plaintiff's primary firewall in its Birmingham office, as well as a 5506 Cisco firewall and a 5508 Cisco firewall for use in plaintiff's other locations. Plaintiff also contracted with defendant for support services in connection with these firewalls, but plaintiff did not subscribe to Cisco's Smart Net support service. In June 2020, the 5516 Cisco firewall failed, so plaintiff purchased a second 5516 Cisco firewall from defendant to replace it. At the end of June 2020, plaintiff terminated its support contract with defendant and chose Enertron as its information technology service provider. According to plaintiff, Enertron reviewed the status of the Cisco firewalls and determined that plaintiff was not the licensed owner with Cisco. Plaintiff alleges that defendant wrongfully sold used firewalls that jeopardized the security of plaintiff's clients' data. Plaintiff brought suit against defendant for breach of contract, breach of express warranty, and fraud/misrepresentation.

At trial, plaintiff's witnesses testified that Cisco informed plaintiff that the firewalls came from an unauthorized distribution system, or the "grey market."[2] In order to become properly licensed with Cisco, plaintiff would have to comply with Cisco's recertification and inspection procedures. Plaintiff was unwilling to cooperate with this procedure because its systems would be exposed to intrusion while the firewalls were under inspection.

In its defense, defendant asserted that plaintiff was properly licensed with Cisco through the devices' serial numbers. Defendant's president testified that it was normal for firewall hardware to pass through overseas distributors before defendant purchased them and sold them to customers. He stated that plaintiff received new firewalls in factory-sealed packages. When plaintiff completed the registration process, the firewalls were properly licensed. Defendant asserted that the firewalls are always licensed under the serial number, and never under the customer's name. Defendant argued that Cisco's recertification process was necessary only if plaintiff wanted to subscribe to Cisco's Smart Net support services.

The trial court found that defendant breached the parties' sales contract by selling plaintiff improperly licensed firewall hardware. The court reasoned that plaintiff was not "named as the registered person, purchaser[,] or licensed purchaser" of the firewalls even though plaintiff bargained to receive these benefits. The court found that plaintiff's understanding was that the firewalls "were going to be registered to them in their name," and it awarded plaintiff damages in the amount of $15,607.12, the cost of the new firewalls that plaintiff purchased to replace the Cisco firewalls. With respect to plaintiff's fraud/misrepresentation claim, the court granted defendant's

---

[2] We note that this and other testimony regarding conversations with Cisco representatives appears to be hearsay, and we question why it was admitted at trial. However, hearsay testimony was used by both parties, neither party objected in the trial court, and neither party raises the issue on appeal.

motion for a directed verdict. The court did not make any findings with respect to plaintiff's breach of express warranty claim.

Plaintiff subsequently moved for imposition of case evaluation sanctions against defendant. Plaintiff asserted that the case evaluation panel awarded plaintiff $12,000, which plaintiff accepted, but defendant rejected. Plaintiff argued that, although MCR 2.403 had been amended after the parties participated in the case evaluation to eliminate liability for sanctions, denying sanctions in this case would work an injustice against plaintiff. The trial court denied plaintiff's motion.

In Docket No. 361868, defendant appeals the court's judgment in favor of plaintiff. In Docket No. 362147, plaintiff appeals the court's denial of its motion for sanctions.

## II. DOCKET NO. 361868

## A. DEFENDANT'S LIABILITY

Defendant argues that the trial court erred by finding that it sold plaintiff improperly licensed firewalls. We disagree.

"We review a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo." *Chelsea Investment Group, LLC v City of Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010). "A decision is clearly erroneous when, although there may be evidence to support it, we are left with a definite and firm conviction that a mistake has been made." *Pioneer State Mut Ins Co v Michalek*, 330 Mich App 138, 145-146; 946 NW2d 812 (2019) (quotation marks and citation omitted). "Because this case was heard as a bench trial, the court was obligated to determine the weight and credibility of the evidence presented." *Wright v Wright*, 279 Mich App 291, 299; 761 NW2d 443 (2008). In reviewing this matter, we defer to such determinations because of "the trial court's superior ability to judge the credibility of the witnesses who appeared before it." *Glen Lake-Crystal River Watershed Riparians v Glen Lake Ass'n*, 264 Mich App 523, 531; 695 NW2d 508 (2004) (quotation marks and citations omitted).

The parties agree that this dispute arises from defendant's sale of goods to plaintiff, and is therefore governed by the Uniform Commercial Code, MCL 440.1101 *et seq*.

Plaintiff argues on appeal that defendant breached the warranty of rightful transfer free from encumbrance because the firewalls were not licensed to plaintiff, and plaintiff could not obtain licensing without undergoing a certification process with Cisco. The implied warranty of title is found in MCL 440.2312, which provides:

> (1) Subject to subsection (2) there is in a contract for sale a warranty by the seller that
>
> (a) the title conveyed shall be good, and its transfer rightful; and
>
> (b) the goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge.

(2) A warranty under subsection (1) will be excluded or modified only by specific language or by circumstances which give the buyer reason to know that the person selling does not claim title in himself or that he is purporting to sell only such right or title as he or a third person may have.

(3) Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like but a buyer who furnishes specifications to the seller must hold the seller harmless against any such claim which arises out of compliance with the specifications.

We do not consider the merits of plaintiff's warranty of title argument because it was not raised in the trial court and because the trial court's judgment in favor of plaintiff was based on breach of contract, not breach of warranty. Plaintiff brought three claims against defendant: (1) breach of contract; (2) breach of *express* warranty; and (3) fraud. The warranty of title is an *implied* warranty that is recognized in all contracts, unless expressly disclaimed, by MCL 440.2312. Plaintiff's claim was for the alleged breach of an express warranty premised on its contention that

Defendant, in order to induce Plaintiff to purchase the firewalls, represented to plaintiff as follows:

a. the firewalls are new; and

b. the firewalls are supported by Cisco; and

c. Plaintiff would receive support from Cisco for three (3) years.

Plaintiff's lower court pleadings have no reference to the implied warranty of title nor the statute in which this warranty is recognized. We decline plaintiff's invitation to consider an entirely new cause of action for the first time on appeal. See *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 234 n 23; 507 NW2d 422 (1993) ("This Court has repeatedly declined to consider arguments not presented at a lower level . . . . We have only deviated from that rule in the face of exceptional circumstances." (citation omitted)).

The trial court's judgment and assessment of damages was based wholly on plaintiff's breach of contract claim; it made no findings with respect to plaintiff's breach of express warranty claim. MCL 440.2202 provides:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to those terms as are included in that memoranda or writing may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented by any of the following:

(a) By course of performance, course of dealing, or usage of trade under section 1303.

-4-

(b) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

The trial court's finding that defendant breached its contract with plaintiff was premised on its finding that the parties agreed plaintiff would be registered with Cisco as the firewalls' licensed purchaser and owner, but this did not happen. The evidence supports this finding, with the most compelling evidence being the invoices. As noted above, the primary firewall was located at plaintiff's Birmingham office and the other two firewalls operated through this firewall. The Birmingham firewall was purchased in 2018, and it was replaced in 2020 when it ceased functioning properly. The invoices accompanying both the 2018 and 2020 purchases indicate that plaintiff purchased both licenses and three years of support services from Cisco. The invoices are consistent with the testimony of plaintiff's Chief Information Officer, Jason Brawner, which established that, at the time of purchase, he expected the products to be licensed with Cisco. Brawner testified that he was informed by Cisco that he could not obtain support from them without undergoing a recertification process involving an inspection, and Michael Green, Enertron's director of IT, testified that plaintiff would not have needed to recertify the firewalls if they had been properly licensed in plaintiff's name. Green further testified that the firewalls did not come through "normal channels" but that they instead came from "grey market" channels.

Defendant argues that the trial court and plaintiff mistakenly perceived the certification and inspection process as a requirement to resolve a defect in licensing status when it was really a requirement to establish a subscription for support. Neither party presented testimony from a Cisco representative. Therefore, the trial court was required to rely on the parties' testimony regarding their understanding of Cisco's relationship with the end-users of its products. Jason Brawner testified that he tried to "obtain licenses" from Cisco, but defendant did not cooperate. He denied ever seeing a document establishing plaintiff's license to use the firewalls. The documents plaintiff obtained from Cisco showed that plaintiff was not the original customer for the firewalls. Enertron's service provider testified that he determined that the Cisco "account" was not in plaintiff's name. As noted above, he learned that Cisco regarded the firewalls as coming from "the grey market" rather than through "normal channels." He stated that he learned from Cisco that the "part numbers" or the "hard-coded serial numbers on the devices themselves" indicated that the parts were sourced from Asia.

The trial court questioned Green as follows:

*Q*. You indicated . . . that the recertification was due to the registration of . . . the firewalls?

*A*. So in the communication, the recertification was required because . . . the hardware was . . . determined to be grey market. Which grey market means that the original place isn't—it's not black market, but it's not due to normal channels. I don't know the exact piece of that process, but it's—the designation that they provide to it is grey market.

*Q*. Okay. Can you explain to me what you mean by grey market?

*A.* So grey market would be that when you went through the process to— grey market would be Cisco's designation for something that when—when it was check on [sic] for the serial number, they expect to see a specific origin of it. And based on our communications with them, they said it would have come out of somewhere in Asia, which I believe to be where it was originally liked sourced. Because part numbers are sold on a regional basis, so U.S. and other place have their own parts that would be part of that—(undecipherable)—. So they had designated part numbers for various regions of what they sell.

*Q.* Okay so—but this was an item—then how did Cisco—even though— whether the licenses were in plaintiff's name or not, how did Cisco say that these were items that they would—

*A.* So there's hard-coded serial numbers on the devices themselves and that's what we used to reference to Cisco when we reached out. You know, we provided the—the license—or the serial numbers on the devices and—and just asked about what's needed to get them transferred. And when we—when we asked to get them transferred, that's when they responded they were—they were grey market and they were required to be inspected.

*Q.* Okay. Now, if plaintiff had the license, it wouldn't have mattered to Cisco at that point? They would have just continued to service the product, upgrade it—I guess service might not be a good word —upgrade the—the product as need be?

*A.* So if the—if the licenses were available—I'm gonna answer in the manner that I believe. If—if they would have been licensed, then they wouldn't be grey market cause they would have been properly licensed on the product itself. You have to link a license with the serial number. And because we couldn't do that initial part, I don't think that there could have been a license associated with it, if that makes sense.

*Q.* Okay. So you're saying that these firewalls were not licensed at all. Is that—do I understand you correctly?

*A.* Cisco couldn't provide that information and they required for them to be—but based on my understanding, no.

*Q.* Okay. So I don't know that you actually answered my question—

*A.* I'm sorry—

*Q.* —maybe you can't answer my question. That's fine. But I kind of get the impression that you're saying that if they were—if they were licensed, that's not—there wouldn't be an issue.

*A.* If they were licensed, we could have transferred the device into the account and that would have been the end of the process.

This testimony established that Cisco informed plaintiff of a defect in plaintiff's right to use the firewalls. The witness was clearly speaking about licensure and right of use, not merely eligibility to obtain a warranty or eligibility to subscribe to Cisco's support services. His testimony contradicted defendant's assertion that Cisco required recertification for the sole purpose of providing plaintiff technical support services and that plaintiff's licensure status was never impaired or defective. His testimony that "[y]ou have to link a license with the serial number," and his explanation that Cisco was unable to do this for plaintiff's devices contradicted defendant's president's testimony that the serial number alone settled the license. His testimony also contradicted the testimony of defendant's president that the only problem between plaintiff and Cisco was that plaintiff wanted Cisco's technical support without having to go through the recertification and inspection process. Moreover, the trial court's questions indicate that, contrary to defendant's arguments on appeal, it understood the distinction between licensure and support.

Therefore, we conclude that the trial court did not err by finding that defendant breached its contract with plaintiff.

## B. DAMAGES

Defendant argues that the trial court improperly determined that plaintiff was entitled to damages for the cost of replacing the Cisco firewalls and that plaintiff breached its duty to mitigate damages.[3] We disagree.

MCL 440.2714(1) provides: "Where the buyer has accepted goods and given notification (subsection (3) of section 2607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."

Defendant argues that the court "mistakenly assessed damages." However, the essence of defendant's argument is essentially a rehash of its argument that it did not breach the contract. Defendant argues that plaintiff "got the benefit of its bargain—it paid for firewalls with licenses and got firewalls with licenses. Under MCL 440.2714(1), damages are therefore $0." This argument is without merit because, as discussed above, plaintiff did not get firewalls with licenses.

Defendant also argues that plaintiff failed to mitigate damages. "Mitigation of damages is a legal doctrine that seeks to minimize the economic harm arising from wrongdoing." *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 538; 854 NW2d 152 (2014). "Specifically, when one has committed a legal wrong against another, the latter has an obligation to use reasonable means under the circumstances to avoid or minimize his or her damages and cannot recover for

---

[3] Isolated comments in defendant's brief suggest that plaintiff was entitled only to a refund for the license fees rather than replacement costs because the latter would result in an impermissible windfall. However, to the extent defendant does raise this argument, it has been abandoned because it was not raised in the statement of questions presented nor was it developed in defendant's analysis. See MCR 7.212(C)(5); *In re Warshefski*, 331 Mich App 83, 87; 951 NW2d 90 (2020).

damages that could thus have been avoided." *Id*. Defendant argues that plaintiff could have limited its damages by paying $2,400 for recertification by Cisco. It argues that the trial court erred by failing to limit plaintiff's damages to that amount. Plaintiff argues that recertification was not a viable option because the hardware would have needed to be physically shipped to Cisco for an inspection, and this would have left plaintiff exposed, while defendant asserts that a representative from Cisco could have gone to plaintiff and performed the inspection on site without disconnecting the firewalls. However, the record before us is not clear regarding whether the firewalls would have needed to be disconnected and shipped.

Plaintiff relies primarily on the testimony of Michael Green, Enertron's director of IT. In particular, plaintiff emphasizes the following excerpt:

> *Q*. Mr. Green, are you familiar with—regarding the firewalls—are you familiar with what—at that point in time—what needed to be done if Conifer wanted to use those firewalls?
>
> *A*. Due to the nature of how they were acquired, the firewalls would need to be recertified. So they'd have to be sent in and then go through the recertification process in order to be licensed.

Defendant's position is likewise supported by testimony from Michael Green:

> *Q*. You mentioned the recertification process. The recertification involves a physical inspection, correct?
>
> *A*. Correct.
>
> \* \* \*
>
> *Q*. All right. But it was available to Conifer to have somebody come out and do physical inspections of its firewalls on behalf of Cisco, correct?
>
> *A*. In order to—to re-license the firewall and put them in an account on their own, it was required.

Green's answer suggests that it was required that a representative of Cisco come to inspect the hardware in order to complete the recertification.

Plaintiff's Chief Information Officer, Jason Brawner, testified that he did not know what the recertification process entailed:

> *Q*. All right, you mentioned that when that happened, you had some ability to—with your existing Cisco firewalls to perform a recertification with an inspection, correct?
>
> *A*. Yeah, it's my understanding from Cisco that we—we—we could go through a recertification process.

*Q.* Which would have involved somebody coming out from Cisco to take a look, correct?

*A.* I'm not sure the exact process, if it—if they physically came on site or if we had to ship the machines. I don't know exactly how that process works.

*Q.* All right. You decided personally, on behalf of Conifer, not to take that path in the road, correct?

*A.* Correct.

*Q.* With the understanding that if you had taken that path, you could have achieved certification from Cisco, correct?

*A.* Potentially.

Finally, defendant's company President, Robert Roche testified that Cisco would have sent a representative out for what he referred to as a "field inspection" and that plaintiff balked at this option because it did not want to pay the fee.

On balance, it is unclear from the record whether plaintiff failed to mitigate damages. The only evidence suggesting that the firewalls would need to be disconnected to undergo recertification was a comment from Michael Green that they would need to be "sent in." While there was evidence suggesting that, at a minimum, plaintiff failed to meaningfully explore the possibility of recertification, the evidence is conflicting. Importantly, the court was hamstrung by the fact that no representatives from Cisco testified, and it was therefore left to sort through secondhand accounts of their procedures. Because defendant, as the breaching party, had the burden to establish that plaintiff did not mitigate damages, see *M & V Barocas v THC, Inc*, 216 Mich App 447, 449-450; 549 NW2d 86 (1996), and because we review for clear error, we decline to disturb the trial court's findings.

For these reasons, we conclude that the trial court did not err by deeming defendant liable for the cost of replacing the firewalls because defendant did not establish that plaintiff failed to mitigate damages.

In conclusion, the arguments raised by defendant on appeal are each without merit.

III. DOCKET NO. 362147

Plaintiff argues that the trial court erred by denying its post-judgment motion for case evaluation sanctions. Because the trial court failed to assess whether application of the new rules would work an injustice, we vacate the court's order denying sanctions and remand for additional proceedings.

Issues concerning the application of a court rule are subject to de novo review. *Safdar v Aziz*, 501 Mich 213, 217; 912 NW2d 511 (2018). "However, a trial court's decision whether the application of new court rules would 'work injustice' under MCR 1.102 entails an exercise of discretion." *Reitmeyer v Schultz Equipment & Parts Co, Inc*, 237 Mich App 332, 336; 602 NW2d

596 (1999). A trial court abuses its discretion if its decision "is outside the range of reasonable and principled outcomes." *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 604; 886 NW2d 135 (2016).

At the time the parties participated in case evaluation, MCR 2.403(O) provided for the imposition of sanctions against a party who rejected a case evaluation award and failed to obtain a more favorable verdict at trial. The case evaluation panel in this case unanimously awarded plaintiff $12,000. On November 4, 2021, the parties were notified that plaintiff had accepted this award and that defendant had rejected it by failing to file a response. Thereafter, on December 2, 2021, MCR 2.403 was amended, effective January 1, 2022, to remove Subrule (O), thereby eliminating the sanction provisions. The bench trial was conducted on April 1, 2022. After receiving a favorable verdict at trial, plaintiff moved for case evaluation sanctions pursuant to former MCR 2.403(O), but the trial court denied plaintiff's motion, simply stating: "Plaintiff's Motion to Assess costs is DENIED, pursuant to MCR 2.403(L)."

MCR 1.102 provides:

> These rules take effect on March 1, 1985. They govern all proceedings in actions brought on or after that date, and all further proceedings in actions then pending. A court may permit a pending action to proceed under the former rules if it finds that the application of these rules to that action would not be feasible or would work injustice.

With respect to amended court rules, the general rule is to apply newly adopted or amended court rules "to pending actions unless there is reason to continue applying the old rules." *Reitmeyer*, 237 Mich App at 337 (quotation marks and citation omitted). There is no bright-line rule for determining when an amended or previous version of a rule applies in a given case. Instead, "a court must look more closely to the particular circumstances of the case at issue and at the purpose of the amendment." *Id*. at 342.

In *Reitmeyer*, the plaintiff moved for sanctions and attorney fees pursuant to the offer-of-judgment rule, MCR 2.405, which at that time, imposed sanctions against a party who rejected an offer of judgment and then received a less favorable verdict. *Id*. at 334-335. The trial court denied the plaintiff's motion because it concluded that the amendment applied retrospectively. *Id*. at 335-336. This Court vacated the trial court's denial of the plaintiff's motion for sanctions and attorney fees because there was "no evidence that the trial court relied on the language of MCR 1.102 to undertake an examination of whether application of the amended version of MCR 2.405 would 'work injustice.' " *Id*. at 336. Rather, "the trial court rested its determination that the amended court rule was to apply in this case on the fact that procedural rules are to operate retrospectively in the absence of a clear contrary intention." *Id*. This Court concluded that this was "not the proper analysis" because the determination of whether a rule should be applied retroactively or prospectively is governed by MCR 1.102. *Id*. at 337.

*Reitmeyer* controls in this case. The trial court did not offer any reasons for its rejection of plaintiff's motion, and it does not appear that it considered MCR 1.102 at all. However, this Court made clear in *Reitmeyer* that "a decision under MCR 1.102 requires an individual determination in this (and in every) case whether such 'injustice' would result from the application of the

amended" rule. *Id.* at 345. The court's limited decision provides no indication that it recognized its discretion to consider whether application of the amended rule to deny sanctions to plaintiff would work an injustice under the circumstances of the case. Therefore, we vacate the trial court's order denying sanctions and remand for consideration of the MCR 1.102 "injustice" exception as it pertains to MCR 2.403 as amended and the specific facts of this case. See *Id.*

## IV. CONCLUSION

We affirm the judgment for plaintiff in Docket No. 361868, vacate the trial court's order denying case evaluation sanctions in Docket No. 362147, and remand for additional proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado